EUGENE N. SANCTUARY, Plaintiff, *v.* DOROTHY S. THACKREY et al., Defendants.

Supreme Court, Trial Term, New York County, July 29, 1947.

*Henry H. Klein* for plaintiff.

*Edward S. Greenbaum, Jerome Handler* and *Herbert Feiler* for defendants.

PECORA, J.   Plaintiff sues to recover damages for libel.   One of the defendants is the owner and publisher, and the other

is the editor and general manager, of a newspaper published daily (except Sundays) in this city, called the " New York Post " (hereinafter referred to as the " Post ").

The alleged defamatory matter is contained in two installments of a book entitled " Under Cover ". They were published in the " Post " issues of October 16, 1943, and November 8, 1943, respectively. The book was written by one John Roy Carlson (a nom de plume), and published by E. P. Dutton & Co., Inc. In it the author details what he claims to have learned as a result of his private espionage, about subversive organizations which he believed were plotting for the seizure and overthrow of our Government.

The proof shows the book was on the best-seller lists in the latter part of 1943, and had been widely reviewed and commented upon. Several hundred thousand copies of it had been sold.

The defendants acquired the right to publish it serially in their newspaper. The same right had been given to various newspapers in other cities. The defendants commenced its daily serial publication on October 16, 1943, and concluded it at about the end of that year.

The initial installment fills pages 24 and 25 of the " Post " issue of October 16, 1943. On page 25 is a picture layout showing a photograph of a small quantity of weapons and ammunition on a table. Underneath this photograph is an inscription reading " Arsenal seized by the F.B.I. in a Brooklyn home. J. Edgar Hoover charged they were to be used in an attempt to overthrow the government. John Roy Carlson describes today the origin of the plot. George Sylvester Viereck, Nazi agent, quoted freely by the Christian Front, and Col. E. N. Sanctuary, retired United States Army officer, were indicted in connection with anti-American activities."

Flanking this photograph of the weapons, on the left and right sides respectively, are photographs of Viereck and Sanctuary (the plaintiff herein) with their names. Over the top of the picture layout across the whole width of the page, is a caption reading " U. S. ' Quislings '. They Plotted to Seize America." Across the top of page 24 for its full width is the inscription " Under Cover! The Nation's No. 1 Best Seller." Across the full width of the front page of the issue of October 16, 1943, is the inscription " The American Quislings Were Under Cover Until Carlson Lifted the Lid. Read It Today on Pages 24 and 25 ".

The installment contained in the issue of the " Post " of November 8, 1943, appears on page 20. It occupies about two

thirds of the page. At the top for the full width of the page is the inscription " Under Cover! The Nation's No. 1 Best Seller! " At the right hand lower corner of the front page of that issue is the inscription " Under Cover! Page 20."

The above described picture layout was not taken from the book itself. The photograph of the " arsenal " had previously been published in 1940 as part of a news item which related to the seizure of the weapons by the F.B.I. in the home in Brooklyn of an alleged member of the Christian Front. Nothing in the text of the two installments referred to the plaintiff as being the person in whose home the weapons had been found, or from whose possession they had been taken. The installments contain a number of statements concerning the plaintiff. They relate chiefly to his dissemination of anti-Semitic literature, and to his association with various persons and organizations engaged in similar activities and in the spreading of pro-Nazi and pro-Fascist propaganda.

In the opinion of this court, the terms " American Quislings " and " U.S. Quislings " in the captions were intended to convey, and did convey to the average reader, that the persons connected with such activities and propaganda were — like the infamous Major Quisling of Norway, who collaborated with his nation's invader — disloyal citizens of their country. Such references to the plaintiff hold him up to hatred, scorn, obloquy and contempt. Hence they are libelous per se (Seelman, Law of Libel and Slander, par. 11); and if they are not substantially true, their publication unless protected by privilege would entitle plaintiff to damages. In their answer the defendants plead the truth, as well as certain other and partial defenses.

Upon the trial a jury was empaneled and sworn. But before the introduction of any evidence, the plaintiff requested a trial of the issues by this court without a jury. With the consent of the defendants the jury was thereupon discharged, and the trial was resumed with the court sitting as the sole trier of the facts.

The evidence clearly reveals that for years plaintiff distributed many books and pamphlets of a violently anti-Semitic nature. He boasted of his authorship of some of them. He addressed a meeting of the notorious German-American Bund in this city in October, 1938, and tried, with some success, to sell his literature at its headquarters.

He helped to circulate the so-called " Protocols of the Elders of Zion ", which purports to outline a plan for world domination by Jews — a plan which in this court's opinion is both imprac-

tical and ridiculous upon its face, but which is set forth with clever sophistry. He expressed his belief in their genuineness, despite the fact that in the world-famous trials in Bern, Switzerland, held in the years 1934–1935, they were adjudicated to be sheer forgeries promulgated for the purpose of creating enmity toward Jews. (See "An Appraisal of the Protocols of Zion", by Prof. Curtiss and other eminent American historians, Columbia Univ. Press, 1942.)

He edited a history of the hate-breeding Ku Klux Klan in 1940–1941, which was indorsed by its Imperial Wizard. He testified that the Klan unqualifiedly supported the principles of the Federal Constitution. But he finally admitted that the Klan's advocacy of "native-born, white, Protestant supremacy" — with its consequent discriminations against Jewish, Catholic, colored and foreign-born American citizens — was inconsistent with those principles.

Referring to the conviction in 1942, in a Federal court, of one William Dudley Pelley for subversive activities, plaintiff stated he believed that Pelley was "unjustly in prison". It was also his judgment that one Ralph Townsend, who was convicted in 1942 in a Federal court of willfully failing to register as a Japanese Government agent, had received "a pretty rough deal". Those assertions afford some indication of plaintiff's lack of respect for our judicial processes.

He also testified that George Sylvester Viereck, who had been convicted of willful failure to register as a German Government agent, was nevertheless an "honorable gentleman" This gives a clue to plaintiff's peculiar conception of honor.

Plaintiff's association with Pelley and Viereck was reflected in his indictment jointly with them and about twenty-seven other defendants, by a Federal Grand Jury in the District of Columbia on January 3, 1944 for subversive acts. That indictment apparently superseded two prior indictments filed respectively on July 2, 1942, and January 4, 1943. During a protracted trial of the indictment in 1944, the presiding judge died, with a resultant mistrial. The indictment has since been dismissed for failure to prosecute.

Plaintiff is avowedly opposed to our democratic plan of government. In one of his publications he flatly declared that "democracy in any form, even with America's system of checks and balances, including a Supreme Court of Justice, was incompetent as a system of government * * *. Democracy has never succeeded and never will."

Plaintiff further admitted it was his purpose to acquaint the people of America with the philosophy of one Jacques Doriot — an acknowledged Fascist leader of France who favored a Nazi victory in World War II. In some of plaintiff's publications approving references were made to Doriot's sentiments.

He undertook in his testimony to palliate the frightful massacres of millions of noncombatant Jews by Hitler in the late war, on the ground that they may have been perpetrated in fulfillment of an Old Testament prophecy, and that Hitler may have been a divine instrumentality to that end.

In the early part of 1941, plaintiff wrote and circulated a booklet entitled " War Guilt and War Mongers." It purports to fix culpability for the outbreak of World War II. America was not then in the war. Nevertheless, plaintiff charged that President Roosevelt, Secretaries Hull, Stimson, Knox, Ickes, Perkins and Morgenthau, U. S. Supreme Court Justices Brandeis and Frankfurter, and many other prominent and respected Americans in both public and private life — most of them being persons of the Jewish faith — were among those responsible for causing the war which Hitler had, in fact, precipitated by his sudden invasion of Poland on September 1, 1939.

Plaintiff also pilloried among the " War Guilty " those leaders of the Governments of England and France who had resisted Hitler's aggressions. He even included therein British Prime Minister Chamberlain, who had frantically sought to appease Hitler at Munich in March, 1939, in an effort to avert the war.

Conspicuously missing from plaintiff's roster of the " War Guilty ", however, are Hitler, Mussolini, Hirohito and all of their followers, as well as all persons connected with the Nazi-controlled Vichy Government of France. This is typical of the warped and distorted reasoning exhibited by plaintiff in virtually all of his writings which were received in evidence.

In that booklet plaintiff fantastically accused President Roosevelt of having had a greater responsbility for the war than any other person. He went so far as to make the following statement therein: " We dare to make this prediction that if the American people do not stop Mr. Roosevelt from getting us in this war * * * future generations, and some of the present, will journey to the shrine he had constructed at Hyde Park with the same morbid motive which prompts like persons to visit the Ford Theatre in Washington. It was there that the immortal Lincoln was shot in the back of his head by John Wilkes Booth."

Those words might readily have incited to assassination one whose passions had been inflamed by such venomous outpourings as flowed from the tongue and pen of plaintiff.

Plaintiff further testified that at about that same period — the early part of 1941 — he called at the German Embassy in Washington and delivered to its officials " evidence " which he had collected to show the alleged complicity of President Roosevelt in a plot to cause the war then raging. He intended that his " evidence " be used in the prosecutions then impending in Riom, France, which had been instituted by the Vichy Government against the leaders of France who, in defense of their country, had defied Hitler.

At that time plaintiff was on the inactive list of reserve officers of the United States Army, with the rank of Lieutenant-Colonel, which he had gained by his noncombat service in World War I.. Notwithstanding that his visit to the German Embassy was made several months prior to America's entry into World War II, plaintiff frankly admitted that he then considered Germany to be an enemy of America and that President Roosevelt was then his Commander-in-Chief.

Thus, by his own testimony, plaintiff presents the shocking spectacle of a retired reserve officer of the U. S. Army gathering " evidence " designed to incriminate his Commander-in-Chief, and turning it over for use to a foreign nation which he deemed to be an enemy of his own country. Yet in this suit he seeks damages from the defendants for having published matter which referred to him as an " American Quisling " who had plotted for the seizure of our Government.

In his complaint plaintiff defines the term " Quisling " to be " one of opprobrium, meaning and intended to mean a person who voluntarily serves his country's enemies." This court does not hesitate to adopt plaintiff's definition. Neither does it hesitate to hold, in view of plaintiff's conceded conduct, that the application of that term to him was substantially justified.

In the Spring of 1941, nearly all the nations of Europe were either under the military control of the Axis powers, or in alliance with them. Almost alone England was desperately fighting against the increasingly triumphant Nazi forces. Our own country had been proclaimed, under acts of Congress, to be in a state of emergency. If plaintiff's confessed deeds, committed against this background, were, as he insists, prompted by his loyalty to America, then perfidy has become a synonym for patriotism. This court rejects plaintiff's protestations as utterly incredible.

It is not necessary to take up arms against one's country in order to betray it or encompass its ruin. The history of the world shows that the sowing of racial and religious prejudices

among a people is often the prelude to the seizure and overthrow of its government. Indeed, that was the very pattern successfully followed by Hitler in Germany. In our own time it has also been demonstrated that such discords render a nation easier of conquest by a foreign power bent upon its domination.

The late World War yielded many unhappy evidences of the effectiveness of fifth columnists and their native allies in preparing a country for seizure. Their formidable weapon was shown to be propaganda subtly planned to divide its people, thereby undermining their confidence in their government and weakening their support of it. It was precisely that kind of vicious propaganda to which plaintiff diligently devoted himself during our country's gravest crisis.

Wise and far-visioned were the builders of our Republic. They bedrocked its government upon a Constitution inspirited with the eternal verity that "all men are created equal."

That Constitution grants to all persons, regardless of race, color or creed, equality before the law. It guarantees to them freedom of speech, of the press, of worship, and of assembly. It places adequate safeguards around their persons, property and homes.

Attracted by these basic principles, men and women from every land have come to our shores, and have here planted their roots with permanence. Throughout the generations they have faithfully toiled with its native sons and daughters, to make America what it is today — the world's finest exemplar of representative democracy — the land of equal rights and opportunity — the country where the human personality may obtain its loftiest dignity.

When America was challenged in the late World War by democracy's foes, her defenders rallied from every city and hamlet. Black and white, Jew and Gentile, Catholic and Protestant, rich and poor, native-born and foreign-born — but Americans all — they worked and fought and died shoulder to shoulder to preserve our country and its ideals.

Their unity of spirit and sacrifice won for us the vital victories of war. That same unity will win for us the not less important victories of peace. He who would disrupt that unity would destroy the free institutions of America.

That unity is imperiled by those who, like the plaintiff, array class against class, creed against creed, and race against race. It is jeopardized by those who, like the plaintiff, would deprive the humblest citizen, because of his race, color or creed, of any of the constitutional rights guaranteed to all in equal measure.

Those who participate in such movements are traducers of America, for they ruthlessly trample upon its Constitution. They are false to their professed Christianity when, in their hooded and blind bigotry, they foment racial or religious hatreds; for it was the Founder of Christianity who taught that love of God and love of neighbor are the two great divine commandments.

Our Constitution cannot enforce itself. Hence eternal vigilance is still the price of our liberties. To enlighten and arouse the people to the dangers which threaten those liberties, both from within and without our gates, is the constant duty of an alert and courageous press. It is equally the solemn obligation of every citizen who values the priceless heritage of our constitutional rights.

This court is satisfied, by overwhelming evidence, that in publishing the matter complained of in this case the defendants discharged that high duty. It is also convinced that their utterances concerning the plaintiff were substantially within the boundaries of the truth. Indeed that finding is amply supported by the testimony of the plaintiff himself.

In order for the defense of justification to prevail, the truth of the defamatory statements need not be shown in meticulous detail. It will suffice to prove that they are true in substance (Seelman, Law of Libel and Slander, pars. 172, 173 and cases cited).

The record contains more evidence than is herein discussed. It has all been weighed. Most of it sustains the court's conclusions. Its recital would therefore unduly extend this statement of the court's decision.

Inasmuch as the court has determined that defendants have established their defense of truth or justification, it is unnecessary to pass upon the issues raised by the partial and other defenses which have been interposed.

Evidence was submitted by plaintiff to show that defendants were motivated by express malice in publishing the defamatory matter. That evidence, however, completely fails of accomplishing its purpose. But even if it had been sufficient to prove the existence of express malice, it would be of no avail to the plaintiff. It has long been the rule that where the defamatory matter is found to be true, its publication even with express malice does not give rise to a valid cause of action (*King* v. *Root*, 4 Wend. 113; *Hunt* v. *Bennett*, 4 E. D. Smith, 647).

Judgment is directed in favor of defendants dismissing the complaint, with costs. Plaintiff may have the usual thirty days' stay and sixty days to make a case. Settle judgment.